# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL B. HODGES,         )
                           )
          Plaintiff,      )
                           )
    v.                 )      No. 04 C 6008
                           )
JO ANNE B. BARNHART,      )      Judge Castillo
Commissioner of Social Security,  )
                           )
         Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael B. Hodges applied for Supplemental Social Security Income ("SSI")
from the Social Security Administration ("SSA"). After the SSA denied his application and
reconsideration request, Hodges requested an evidentiary hearing. At the conclusion of the
evidentiary hearing, the Administrative Law Judge ("ALJ") found that Hodges was not disabled.
After the Social Security Appeals Counsel denied his request for review, Hodges sought judicial
review of the ALJ's decision. Hodges has brought a motion for summary judgment seeking to
reverse the ALJ's decision. For the following reasons, we affirm the ALJ's decision and deny
Hodges' motion.

### RELEVANT FACTS

## I.    The Administrative Hearing

Hodges initially appeared before the ALJ on July 11, 2003, without representation. The
ALJ informed Hodges of his right to representation during the hearing. (R.17, Supp. Admin.
Record at 583.) The ALJ postponed the hearing to copy and distribute the medical evidence

1

provided by Hodges and to allow Hodges an opportunity to retain counsel. (*Id*. at 586-87.) Hodges returned for a substantive hearing on October 21, 2003, again without representation. The ALJ conducted a substantive hearing at that time. *(Id*. at 533.)

## II.    Hodges' Testimony

Hodges is currently thirty-one years old. Hodges is single and lives with his grandparents. He completed a high school education and one year of college. Prior to his illness, Hodges worked as a laborer, a writer, a musician, and an electrician's assistant. (*Id*. at 66, 74, 557, 560.) He drives and does not utilize a handicapped parking permit. (*Id*. at 558, 563.) Hodges cooks, does laundry, shops, makes his bed, and occasionally visits family members, but does not clean or work. (*Id*. at 83, 88, 100, 106, 565.)

During the hearing, Hodges complained of several impairments, including joint inflammation, pain, confusion, vertigo, atrial fibrillation, and chemical sensitivity. (*Id*. at 557-59, 561, 563-64, 566-67.) He noted that his neurological symptoms improved with medication. He was prescribed a variety of medications over the past several years, including self-administered intravenous drugs. (*Id*. at 558, 561.) He refuses to take any kind of pain medication. (*Id*. at 565.) At the time of the hearing, Hodges took only vitamin supplements. (*Id*. at 565, 567.)

Hodges indicated that the medical record was complete during the administrative hearing. (*Id*. at 554-555.) Hodges also provided written descriptions of his impairments by way of the SSA's disability report questionnaire. In the questionnaire, Hodges reported suffering from fatigue, confusion, racing heart, and low endurance. (*Id*. at 65.) Hodges also stated that his symptoms are inconsistent. (*Id*. at 65.)

2

## III. Hodges' Medical History

### A. Outpatient Care

The record contains over fifty pages documenting Hodges' treatment at Central DuPage Hospital for symptoms associated with Lyme disease or medications taken to control his illness. The record indicates that Hodges sought treatment for a wide range of ailments, including, but not limited to, chest pain, (*id.* at 154, 218, 319), shortness of breath, (*id.* at 154), palpitations, (*id.* at 154), weakness, (*id.* at 197, 263, 267), dizziness, (*id.* at 256, 259), nausea, (*id.* at 256), pain in his right flank, (*id.* at 267, 332), fever, (*id.* at 307), and complications with his indwelling peripherally inserted cardiac catheter ("PICC line"), (*id.* at 203, 312, 317). Hodges' complaints typically varied from one emergency room visit to the next. When Hodges presented with consistent symptoms, his condition was corrected by medication or surgery. For example, Hodges' gall bladder was removed in 2002 following multiple emergency room visits for treatment of pain in his right side. (*Id.* at 332.) Similarly, Hodges was treated at Central DuPage Hospital for atrial fibrillations, which converted to sinus rhythm spontaneously upon treatment with medications. (*Id.* at 154-55, 288, 291-93.) Hodges retained sinus rhythm for several months after the atrial fibrillation episodes. (*Id.* at 360.)

From 1999 to 2003, Central DuPage Hospital conducted numerous diagnostic tests to determine the origin of Hodges' ailments. The cause of Hodges' chief complaints– heart palpitations, fatigue, and chest pain– remain unknown. Physicians administered a stress exercise test in January 1999, and performed echocardiography in October 1999 and January 2000. (*Id.* at 169, 181.) The results of the diagnostic tests were unremarkable. (*Id.* at 169, 181.) Likewise, no significant cardiac abnormalities were identified via Holter monitoring in October 1999, April

3

2000, and December 2001. (*Id.* at 166, 171.) Chest X-rays performed in August 1999, September 1999, October 1999, January 2000, November 2001, and April 2002 were normal. (*Id.* at 156, 166, 174-75, 319.) Abdominal imaging in October 2001 and April 2002 also was unremarkable. (*Id.* at 263, 332.)

## B. Medical Consultations

Hodges sought out numerous laboratory tests and medical exams during the course of his treatment. It appears that Hodges was first diagnosed with Lyme disease in December of 1998. (*Id.* at 140-142.) In August and December 1999, Hodges was seen by Dr. Dugan at Suburban Lung Associates for respiratory evaluation. Dr. Dugan noted that Hodges' exam was unremarkable, demonstrating normal air flow, vocal cord dysfunction, gastroesophageal reflux, and allergies. (*Id.* at 149-150.) Vocal cord exercises alleviated a degree of Hodges' discomfort. (*Id.* at 148.)

Hodges consulted with MidWest Heart Specialists ("MidWest") periodically from December 1998 until January 2000. Physicians at MidWest examined Hodges in December 1998 and January 1999 to address his complaints of chest discomfort and palpitations. (*Id.* at 189-94.) Heart monitoring via Holter monitor and echocardiogram revealed no significant abnormalities. (*Id.* at 189-94.) In November 1999, Hodges again consulted with MidWest regarding his heart palpitations. Hodges informed MidWest of his atrial fibrillation that occurred in October 1999. (*Id.* at 185.) He exhibited no symptoms of palpitations or irregular heartbeat following treatment at Central DuPage Hospital for atrial fibrillation. (*Id.* at 185.) MidWest performed an echocardiogram, which suggested that Hodges' atria were normal. Hodges denied any dizziness, new rashes, or limiting arthritis during his appointment. (*Id.* at 185.) Hodges was examined again

4

two weeks later complaining of atypical chest discomfort. (*Id.* at 187.) Hodges reportedly experienced heart palpitations upon receiving intravenous antibiotics through his PICC line. (*Id.* at 187.) Again, Hodges denied suffering from new rashes, limiting arthritis, or new allergies. (*Id.* at 187.) His "stress-echo" test, echocardiogram, and Holter monitor readings were normal. (*Id.* at 187.)

During an appointment in January 2000, Hodges stated that he will require antibiotics for the rest of his life because of "demons in his 'heart that he needs to kill.'" (*Id.* at 183.) Hodges also complained of chest pain caused by spirochetes, the organism associated with Lyme disease, "eating through his heart." (*Id.* at 183.) He arrived over four hours late to his appointment and did not remember that he had called the office throughout the day. (*Id.* at 183.) He denied suffering from new rashes, shortness of breath, or limiting arthritis. (*Id.* at 183.) He appeared alert and oriented to time, place, and person. (*Id.* at 183.) The examining physician noted Hodges' palpitations but questioned the Lyme disease diagnosis. (*Id.* at 183.) The examining physician concluded that Hodges' symptoms were not cardiac-related and suspected Hodges suffered from underlying psychiatric disturbances. (*Id.* at 183.)

In May 2002, Hodges underwent brain SPECT imaging at Edward Hospital Department of Radiology. (*Id.* at 363.) The imaging demonstrated mildly decreased activity within the temporal lobes and right thalmus, as well as mild periventricular white matter activity. (*Id.* at 363.) The technician identified no specific features to suggest Lyme cerebritis. (*Id.* at 363.)

The record contains only one letter from a physician stating that Hodges suffers from complications of Lyme disease that prevent him from gaining employment or keeping a reliable schedule. (*Id.* at 550.) The letter–from Dr. Jack Zoldan–was submitted after the administrative

hearing on May 7, 2004. There is no indication in the record as to the identity of Dr. Zoldan or his qualifications. The letter provides no reasoning or medical evidence supporting Dr. Zoldan's statement.

### C. Hodges' Treating Physician's Report

The record contains progress notes and reports from Hodges' treating physician, Dr. Susan Busse, spanning from March 1999 through May 2003. Hodges complained of a variety of symptoms during his visits with Dr. Busse, including photosensitivity, (*id.* at 373), vertigo, (*id.* at 378), dizziness, (*id.* at 380), palpitations, (*id.* at 382), anxiety, (*id.* at 391), weakness, (*id.* at 409), chest pain, (*id.* at 409), fatigue, (*id.* at 423), rashes, (*id.* at 423), and memory loss, (*id.* at 424). Dr. Busse's progress notes indicate that Hodges' ailments, including his heart palpitations, were transient and controlled with medication. (*Id.* at 378, 380, 388.)

Dr. Busse also completed arthritic, cardiac, and neurological report forms provided by the SSA. In the arthritic report dated June 21, 2001, Dr. Busse stated that Hodges' endurance was very low, but noted no other limitations. (*Id.* at 228.) Dr. Busse indicated that Hodges did not suffer from cardiac abnormalities, but experienced cardiac arrhythmia that was controlled by treatment. (*Id.* at 230.) She also noted Hodges' complaints of chest pain that occurred once or twice a day. (*Id.* at 231.) The chest pain was alleviated by rest and medication. (*Id.* at 231.) Dr. Busse suggested that Hodges may not lift more than ten pounds frequently. (*Id.* at 232, 238.) The cardiac report stated that Hodges suffered from an episode of atrial fibrillation. (*Id.* at 232.) Dr. Busse reported that Hodges' neurological faculties were normal. (*Id.* at 234-35.) She did not report any psychotic disturbances. (*Id.* at 234-35.)

On November 13, 2003, Dr. Busse submitted Form AH-1151, Medical Source Statement

of Ability to do Work-Related Activities (Physical), after the administrative hearing and at the request of the ALJ. Dr. Busse opined that Hodges' abilities are limited by his impairment, but he is capable of lifting twenty five pounds on a frequent basis and standing or walking at least two hours in an eight hour workday. (*Id.* at 544.) Hodges' ability to sit is not affected by his impairment. (*Id.* at 545.) He may, however, have difficulty pushing or pulling due to stiffness and fatigue. (*Id.* at 545.) The report also notes that Hodges' manipulative functions and sight may be limited. (*Id.* at 546.) Dr. Busse cited Lyme disease and adrenal fatigue as the basis for Hodges functional limitations. (*Id.* at 545-46.)

## IV.    Psychiatric Evaluation and Mental Residual Functional Capacity Assessment

Hodges underwent a psychiatric examination on July 16, 2001, performed by Dr. Joseph Nemeth. (*Id.* at 236-37.) Hodges arrived at the appointment neatly dressed and well groomed. (*Id.* at 236.) Hodges complained of lack of concentration, forgetfulness, "brain fog," and becoming easily frustrated. (*Id.* at 236.) Dr. Nemeth reviewed Hodges' medical records, noting Hodges' complaints at MidWest Heart Specialists of atypical chest pain caused by "a spirochete eating through his heart." (*Id.* at 236.) Dr. Nemeth characterized Hodges as anxious and preoccupied with Lyme disease. (*Id.* at 237.) Hodges understood and answered Dr. Nemeth's questions, and denied any psychotic experiences, delusional thinking, hallucinations, or paranoia. (*Id.* at 236-37.) Dr. Nemeth reported that the physician's report from MidWest suggested a questionable psychiatric disturbance and proposed that Hodges suffers from Axis I Psychotic disorder, not otherwise specified, by history. (*Id.* at 237.) However, Dr. Nemeth did not observe any psychotic behavior. (*Id.* at 236-37.) The administrative record also disclosed that Hodges never hallucinated, was never paranoid, and did not suffer from a psychiatric disorder. (*Id.* at 91-

7

92.)

On October 5, 2001, a mental residual functional capacity assessment was prepared by Dr. Erika Altman, an SSA consultant, based on Dr. Nemeth's evaluation and other relevant evidence. Dr. Altman noted Dr. Nemeth's proposed Axis I psychotic disorder diagnosis, but concluded that Hodges' mental status was unremarkable. (*Id.* at 241.) According to Dr. Altman, Hodges can perform simple, routine tasks. (*Id.* at 241.)

## V. Physical Residual Function Capacity Assessment

On October 10, 2001, Dr. Robert Patey, an SSA medical consultant, completed a physical residual function capacity ("RFC") assessment. (*Id.* at 365-72.) Dr. Patey declared that Hodges' primary symptoms were fatigue, exhaustion, and weakness. (*Id.* at 365-72.) Dr. Patey acknowledged that definitive evidence of cardiac involvement was not present in the medical history, but noted that Hodges experienced episodes of atrial fibrillation. (*Id.* at 365-72.) No cardiac structural defects were detected. (*Id.* at 365-72.) The record did not support neurological or arthritic conditions. (*Id.* at 365-72.) Dr. Patel concluded that Hodges can lift ten pounds frequently and stand, walk, or sit six out of eight hours. (*Id.* at 365-72.) Dr. Patel further opined that Hodges has unlimited push and pull capacity, but some postural limitations. (*Id.* at 365-72.) Dr. Virgille Pilapil, also an SSA medical consultant, independently reviewed the medical evidence and affirmed Dr. Patel's findings. (*Id.* at 365-72.)

## VI. Medical Expert's Testimony

Dr. Carl Leigh, an SSA medical expert, testified during the administrative hearing. Dr. Leigh had not personally examined Hodges, but he reviewed the medical evidence that Hodges provided. (*Id.* at 568-69.) Dr. Leigh inquired as to Hodges' cardiovascular health and joint pain.

(*Id.* at 569-570.) Hodges testified he experienced pain in either his joints or muscles, and suffered swollen joints in his feet, elbows, and knuckles. (*Id.* at 569-70.) After reviewing the medical evidence and conferring with Hodges, Dr. Leigh testified that Hodges suffered from Lyme disease and had been treated accordingly despite inconsistent diagnostic test results. (*Id.* at 571.) Dr. Leigh noted that Hodges suffered from atrial fibrillation in 1999, but achieved regular cardiac rhythm in 2001. (*Id.* at 571.) A SPECT image of Hodges' brain showed no symptoms of Lyme cerebritis or inflammation of the cerebral lobes of the brain. (*Id.* at 571.) Dr. Leigh also noted the onset of joint inflammation in 1998. (*Id.* at 572.) Dr. Leigh further testified that the medical evidence, including physician's progress notes, all describe intermittent symptoms. (*Id.* at 572.)

Dr. Leigh testified that Hodges' impairments, alone or in combination, do not meet or equal the listings found in Appendix 1, Subpart P, Regulation No. 4 ("the disability listings"). (*Id.* at 572.) He noted that there is no listing for Lyme disease, nor is there any SSA-issued ruling or regulation regarding Lyme disease. (*Id.* at 572.) Dr. Leigh characterized Hodges' residual functional capacity as limited to light physical exertion, with occasional postural limitations such as kneeling, crawling, crouching, or stooping, with avoidance of hazardous unprotected heights or hazardous machinery. (*Id.* at 573.) Dr. Leigh testified that he agreed with Dr. Patel's RFC assessment of October 10, 2001. (*Id.* at 573.)

## VII. Vocational Expert's Testimony

Mr. Stanley Hutton, a vocational economic analyst, testified at the administrative hearing as a vocational expert. Mr. Hutton defined the relevant region as the Chicago Metropolitan area, including Cook and McCollard counties. (*Id.* at 574.) Having reviewed the exhibits in the case and observed the testimony at the hearing, Mr. Hutton characterized Hodges' past relevant work

9

as a laborer in the heating and air conditioning fields as medium and semi-skilled. (*Id.* at 574.) Hodges' past relevant work as an electrician assistant also was medium and semi-skilled. (*Id.* at 574.) Hodges' work in construction was characterized as heavy and either semi-skilled or unskilled. (*Id.* at 574.) Hodges' work mowing lawns was characterized as medium and unskilled. (*Id.* at 574.)

The ALJ proposed a hypothetical RFC to Mr. Hutton based on the limitations asserted by the medical expert and articulated in Dr. Patel's RFC assessment. The hypothetical proposed light RFC, lifting up to 20 pounds occasionally, lifting 10 pounds frequently, the ability to stand six out of eight hours, limited postural movements such as crawling, crouching, occasional stooping, and occasional climbing, and no climbing of ladders, working with dangerous machinery, or unprotected heights. (*Id.* at 575.) Mr. Hutton testified that those limitations would not allow for Hodges' past relevant work. Mr. Hutton noted, however, that several jobs in the region fit within the proposed limitations, including 7,000 light unskilled cashier positions, 1,800 light unskilled messenger positions, and 2,700 light unskilled packaging and filling machine operators. (*Id.* at 575.)

## VIII. The ALJ's Decision

The ALJ applied the requisite five-step disability analysis pursuant to 20 C.F.R. § 416.920 (2003). First, the ALJ determined that Hodges has not engaged in substantial gainful activity since he allegedly became disabled. (*Id.* at 17.)

Step Two requires the ALJ to determine if the claimant's impairment is severe. The ALJ held that the medical evidence indicates Hodges has a history of Lyme disease and atrial fibrillations, which are severe within the meanings of the SSA Regulations. (*Id.* at 17.)

The third step of the disability analysis requires the ALJ to determine whether Hodges' impairments meet or are medically equal any of the impairments found in the disability listing. The ALJ's decision lists a number of the impairments discussed in Hodges' medical history, including Lyme disease, low endurance, confusion, dizziness, weakness, pain, racing heart, vertigo, fatigue, the PICC line, and complete neurological symptoms. (*Id.* at 17.) The ALJ concluded, however, that the medical evidence indicates that Hodges suffers from Lyme disease and a history of atrial fibrillations for the purpose of the disability analysis. (*Id.* at 17.) Although Hodges' impairments are severe, the ALJ determined that his impairments, alone or in combination, are not severe enough to meet or medically equal one of the impairments found in the disability listing. (*Id.* at 17, 20.)

Step Four of the analysis requires the ALJ to determine whether Hodges' RFC permitted him to perform any past relevant work. The ALJ concluded that Hodges is unable to return to his past relevant work. (*Id.* at 18-19.)

Step Five requires the ALJ to determine if the claimant is capable of performing any other work that exists in significant numbers in the national economy. Based on his review of the evidence and the testimony at the hearing, including the opinions of treating and non-treating physicians familiar with Hodges' case, the ALJ concluded that Hodges retains the residual functional capacity to perform a somewhat restricted range of light unskilled work. (*Id.* at 18.) Specifically, the ALJ concluded that Hodges can not climb ladders, ropes and scaffolds, and can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (*Id.* at 18.) Suitable employment avoids exposure to unprotected heights and dangerous moving machinery. (*Id.* at 18.) The ALJ noted that Hodges' ability to perform all or substantially all of the

11

requirements of light work is impeded by his illness. Upon consideration of the vocational expert's testimony and Hodges' age, education, work experience, and residual functional capacity, the ALJ concluded that Hodges is capable of making a successful adjustment to work that exists in significant numbers in the regional economy. (*Id.* at 18-20.) As such, the ALJ concluded that Hodges is not "disabled" as defined by the Social Security Act.

## LEGAL STANDARDS

This Court will affirm the ALJ's decision regarding Social Security benefits if it is free from legal error and the factual determinations are supported by substantial evidence. 42 U.S.C. § 405(g) (2004); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine if a factual decision is based on substantial evidence, we "review the entire administrative record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Id.* This is a "deferential but not entirely uncritical standard." *Golembiewski*, 322 F.3d at 915.

## ANALYSIS

Hodges contests the ALJ's decision on three grounds. First, Hodges contends that the ALJ failed to obtain a valid waiver of Hodges' right to representation at his administrative hearing. Second, Hodges asserts that the ALJ failed to fully and fairly develop the record by failing to analyze evidence and articulate reasons as to why Hodges' condition did not meet or equal in severity and duration one of the impairments found in the disability listing. Finally, Hodges contends that the ALJ's determination under step four of the disability analysis was patently

wrong because the record was not fully and fairly developed.

## I.    Hodges' Pro Se Status

A claimant has a statutory right to representation at his disability hearing. 42 U.S.C. § 406 (2004); *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). If properly informed of that right, the claimant may waive it. *Binion*, 13 F.3d at 245. Both parties in this case agree that Hodges did not validly waive his right to representation at his hearing. As a result, the burden is on the Commissioner to prove that the ALJ discharged his heightened duty to develop the record. *Id.* "The ALJ's duty to develop the record fully and fairly where the claimant proceeds without counsel is met if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Id.* The ALJ's special duty "requires, essentially, a record which shows that the claimant was not prejudiced by lack of counsel." *Thompson v. Sullivan*, 933 F.2d 581, 586 (7th Cir. 1991) (citing *Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982)). If the Commissioner meets this burden of proving that the record was developed fully and fairly, the burden shifts to the claimant to rebut this showing by demonstrating prejudice or an evidentiary gap. *Binion*, 13 F.3d at 245.

Hodges does not claim that the ALJ failed to uncover any evidence relating to his illness. Indeed, the ALJ sufficiently probed into Hodges' voluminous medical records, adequately questioned him in the course of the administrative hearing, and provided Hodges' with an opportunity to comment on his condition and provide additional medical records if available. Hodges does not identify any evidentiary gaps in the record that would require remand. See *Binion*, 13 F.3d at 245. Instead, Hodges asserts that the ALJ failed to sufficiently articulate the reasons that Hodges' condition did not meet or equal in severity or duration one of the

impairments in the ALJ's Step Three analysis.

It is well established that an ALJ must articulate his analysis at some minimal level and state reasons for accepting or rejecting "entire lines of evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). "Minimum level of articulation" is sufficient articulation to demonstrate that the ALJ considered the evidence the law requires him to consider. *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985). The requisite level of articulation is heightened when there is conflicting evidence or when the ALJ rejects uncontradicted evidence. *Hodes v. Apfel*, 61 F. Supp. 2d 798, 807 (N.D. Ill. 1999). However, an ALJ need not evaluate in writing every piece of evidence in the record. *Herron*, 19 F.3d at 333.

The ALJ's decision demonstrates that the ALJ considered the evidence that the law requires him to consider. The record reflects that Hodges suffers from a variety of ailments secondary to Lyme disease. For example, Hodges allegedly suffers from photosensitivity, neurological symptoms, vertigo, atrial fibrillations, heart palpitations, atypical chest discomfort, arrhythmias, leucopenia, right quadrant pain, allergies, depression and anxiety, fatigue, weakness, and exhaustion. The ALJ's decision shows that the ALJ considered all of the relevant evidence by explicitly referring to Lyme disease, low endurance, confusion, dizziness, weakness, pain, racing heart, vertigo, fatigue, Hodges' PICC line, atrial fibrillations, chest tightness, confusion, and complete neurological symptoms. The ALJ further indicated that Hodges' symptoms and limitations were "duly noted" and taken into consideration. Although the ALJ's decision acknowledges Hodges' claimed impairments, the ALJ did not explicitly recite all of the ailments in his findings. However, the ALJ did not ignore "entire lines of evidence." Cf. *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988). Instead, the ALJ summarized the substantial medical

14

evidence provided by the claimant and considered the medical evidence in its entirety.

Furthermore, the ALJ's decision builds a logical bridge from the evidence to his conclusion. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). In addressing the Step Three determination, the ALJ stated that the medical evidence indicated that Hodges' Lyme disease and history of atrial fibrillations are "severe" within the meaning of the regulations but not "severe" enough to meet or medically equal, either singly or in combination, one of the impairments found in the disability listing. Although, there is no listing for Lyme disease, Hodges argues that the ALJ did not sufficiently articulate why Hodges' many symptoms do not medically equal another listed impairment. The ALJ's decision, however, states that the medical record is replete with *intermittent* symptoms, which also was noted by Dr. Leigh at the administrative hearing. Indeed, Hodges was treated numerous times by Dr. Busse, but the progress reports establish that Hodges' symptoms were not constant. Many times, Hodges reported improvement or alleviation of symptoms, although his health never returned to "normal." In addition, the ALJ's decision noted that many of Hodges' symptoms are controlled by medication. The ALJ's decision draws a logical connection between the intermittent nature of Hodges' symptoms and the lack of medical equivalence to any of the disabilities recited in the disability listing. While it is always possible to provide a more detailed explanation, the ALJ is not required to explain the role of each piece of evidence in his decision. *See Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999). The ALJ's decision provides this Court with sufficient reasoning to understand how and why the ALJ came to his conclusion.

Hodges asserts that the ALJ adopted the Dr. Leigh's opinion without articulating the reasons that Hodges' impairments are not medically equivalent to the listings recited in the

disability listings. An ALJ can rely upon the conclusions of physicians in determining medical equivalence. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Dr. Leigh noted that he reviewed the evidence, and that Hodges' impairments did not meet and were not medically equivalent to a listing. The ALJ considered Dr. Leigh's conclusions in the decision. However, the ALJ fulfilled his burden for minimal articulation as to the reasons for denying Hodges' claim. The ALJ's analysis at Step Three was sufficient to fully and fairly develop the record.

## II.    The ALJ's Step Four Determination

Hodges contends that the ALJ's Step Four determination was patently wrong because the record was not fully and fairly developed. Hodges points to several alleged deficiencies in the record, which are described in detail below. Contrary to Hodges' assertions, the ALJ fully and fairly developed the record and based his conclusions on substantial evidence.

### A.    The RFC Assessment

Hodges asserts that the medical examiner, Dr. Leigh, offered a flawed RFC, which the ALJ adopted in his analysis at Step Four. Specifically, Hodges asserts that Dr. Leigh's RFC is flawed for failing to consider the nonexertional impairment of an Axis I psychotic disorder, not otherwise specific. An ALJ is not obliged to discuss evidence that is not supported by clinical findings. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989). In *Anderson,* a claimant pointed to a number of references of congestive heart failure ("CHF") in progress notes from a health center. *Id.* at 924-25. The ALJ did not mention evidence of CHF in the decision, but noted that the evidence does not support an impairment listed under cardiovascular system. *Id.* at 924. The court held that the evidence cited by the claimant was not supported with clinical findings in the record, and the ALJ was not required to discuss it in the decision. *Id* at 924.

16

The facts in this case are analogous to *Anderson*. The Axis I psychotic disorder diagnosis first appears on a psychiatric consultation report by Dr. Nemeth, who suggested the presence of a psychotic disorder " by history." Dr. Nemeth noted that Hodges answered the examination questions satisfactorily and was groomed and neatly dressed at his appointment. Hodges denied experiencing paranoia, hallucinations, or psychotic episodes. Dr. Nemeth concluded that Hodges was somewhat anxious and was extremely focused on his illness. Dr. Nemeth's suggestion of an Axis I psychotic disorder is based on Hodges' irrational statements during a single MidWest appointment, during which the consulting physician noted the possibility of an underlying psychiatric disturbance. However, the record contains no other evidence that Hodges suffers from a psychotic disorder. None of the other physicians that examined Hodges, including his treating physician, observed signs of psychotic behavior. Hodges never complained of suffering from a psychotic disorder during the administrative hearing or during his numerous emergency room visits. Given the lack of clinical evidence with respect to any psychotic disorder, further investigation into the diagnosis was not required and the ALJ was not required to discuss it in his opinion. *Id.*

Hodges further argues that the ALJ adopted Dr. Leigh's recommendations without discussing or analyzing any other evidence. Dr. Leigh stated in his testimony that he reviewed the medical records provided by Hodges in arriving at his conclusions. Dr. Leigh's inquiries during the administrative hearing showed his thorough understanding of Hodges' condition. Dr. Leigh's RFC assessment was well-reasoned, based on the entirety of the medical evidence, and consistent with that of two other consulting physicians. Additionally, the ALJ considered Hodges' medical evidence concerning his illness in making his conclusion. As a result, the ALJ fulfilled his duty to

uncover all relevant evidence in preparing a full and fair record.

## B.     The ALJ's Reliance On The Treating Physician's Opinion

Hodges contends that the ALJ failed to give sufficient deference to Dr. Busse's opinion and did not seek clarification regarding ambiguities in the record. Hodges also asserts that the ALJ did not fully develop the record because he failed to ascertain the PICC line's limiting effects on Hodges' functioning, failed to clarify the initial Lyme diagnosis, and failed to clarify inconsistencies as to certain diagnostic tests.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2) (2000); *Ynocencio v. Barnhart*, 300 F. Supp. 2d 646, 656 (N.D. Ill. 2004). However, it is the ALJ that is charged with determining the ultimate issue of disability. See 20 C.F.R. § 404.1527(e). Here, the ALJ considered Dr. Busse's progress notes on Hodges' care, which included descriptions of many of Hodges' symptoms. The progress notes indicate that the symptoms Hodges described were intermittent and controlled relatively effectively by medication. In fact, Dr. Busse stated that Hodges made "tremendous progress" under her care. (R.17, Supp. Admin. Record at 283.) The ALJ also noted that Hodges' symptoms were intermittent and controlled by medication. Thus, the ALJ's conclusions as to the extent of Hodges' condition are consistent with Dr. Busse's evaluations. In fact, the ALJ's conclusion regarding Hodges' ability to work is more favorable to Hodges than Dr. Busse's recommendation. While Dr. Busse opined that Hodges could engage in sedentary to medium work despite his illness, the ALJ concluded that Hodges has the residual functional capacity to perform a restricted range of light unskilled work.

The ALJ did not defer to Dr. Busse's suggestion that Hodges could stand for "at least" two hours, which could be interpreted to indicate that Hodges cannot stand for the six of eight hours required for light work. Dr. Busse's opinion on this issue, however, is not well supported and is contradicted by the testimony of three other physicians. Controlling weight is only given to a treating physician's opinion if it is "not inconsistent" with other substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2); *Winfield v. Barnhart*, 269 F. Supp. 2d 995, 1006 (N.D. Ill. 2003). An ALJ may rely on the opinions of consulting or non-treating physicians who specialize in social security disability evaluation. *Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1201-02 (N.D. Ill. 2005). Three consulting physicians specializing in social security disability evaluation analyzed Hodges' entire medical history. All three physicians agreed that Hodges' residual functional capacity enabled him to perform light unskilled work. As a result, the ALJ's decision in this regard is supported by substantial evidence.

In addition, Hodges fails to identify any evidentiary gap or investigative error in the record to support his argument that the ALJ failed to fully develop the record with respect to the PICC line and diagnostic testing. If the evidence received from a treating physician or other medical source is inadequate to make a determination of disability, those sources must be re-contacted to obtain additional information. 20 C.F.R. § 404.1512(e)(1) (2003). Additional evidence or clarification from a medical source must be sought when there is a conflict or an ambiguity that must be resolved, necessary information is missing, or a report does not appear to be based upon objective evidence. *Id.* Here, the ALJ questioned Hodges regarding the PICC line during the administrative hearing and Hodges never asserted that his PICC line prohibited him from engaging in gainful employment. (R.17, Supp. Admin. Record at 561.) The record contains no

19

evidence that the PICC line impairs Hodges' functioning with the exception of a few emergency room visits relating to maintenance of the line. Dr. Busse's evaluations did not cite the PICC line as a limitation. The medical expert, having reviewed the record containing information regarding Hodges' PICC line, found Hodges was not disabled under the guidelines. Thus, the ALJ considered information regarding the PICC line from several sources, including Hodges himself, and found it insufficient to declare the claimant disabled. The Court concludes that the ALJ's decision is supported by substantial evidence in the fully developed record.

Hodges also asserts that the ALJ should have followed-up with Dr. Busse to clarify ambiguities in the record related to diagnostic tests. Hodges points to three sources of ambiguity: Dr. Leigh's characterization of his Lyme diagnosis as being at a "low level," alleged inconsistencies between neurological and cardiac tests, and Dr. Busse's inconsistent statements as to the claimant's ability to lift and carry. This Court does not consider these minor inconsistencies to require remand. In *Ynocencio v. Barnhart*, the ALJ failed to follow-up with the claimant's treating physician to determine the existence of anatomical or physiological abnormalities underlying the claimant's assertion of pain. 300 F. Supp. 2d at 657. The court held that the ALJ failed to develop a full and fair record with respect to this *key* determination that was "*vital* to the outcome of the case." *Id.*

The alleged ambiguities cited by Hodges are not vital to the ALJ's determination, and did not require further investigation. First, Dr. Leigh's statement characterizing Hodges' Lyme diagnosis as "low level" refers to the inconsistency in the testing over the course of two days. However, both Dr. Leigh and the ALJ assumed Hodges suffers from Lyme disease in their analyses. The allegedly ambiguous statement does not affect the ALJ's decision because there is

20

no recitation of Lyme disease in the disability listing. The ALJ recognized that Lyme disease, the symptoms associated therewith, and Hodges' treatment interfere with Hodges' abilities and formulated his decision accordingly. Contrary to Hodges' assertion, the ALJ's failure to conduct further investigation into Hodges' diagnosis does not prejudice him in any way. Second, the record is filled with diagnostic test results, a vast majority of which show, at most, insignificant physiological abnormalities. Minor inconsistencies in laboratory results based on a patient's subjective complaints do not render a record ambiguous. Finally, the discrepancy in Dr. Busse's statements regarding Hodges' ability to lift and carry do not cast doubt on the ALJ's decision. The ALJ concluded that Hodges' RFC permits him to lift ten pounds frequently, adopting the treating physician's most conservative opinion. The alleged missing information is relatively minor in the context of the record, and is not vital to the ALJ's determinations. Indeed, Hodges has not explained how additional clarification of the record would change the ALJ's decision.

### C.    The ALJ's Hypothetical

Hodges contends that the ALJ presented a flawed hypothetical to the vocational expert because the hypothetical did not include all of Hodges' impairments. A hypothetical question posed to a vocational expert should contain the main impairments suffered by the claimant to the extent they are supported by substantial evidence in the administrative record. *Herron*, 19 F.3d at 337. However, an ALJ is not required to include every one of claimant's impairments in posing such a hypothetical. *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). "All that is required is that the hypothetical question be supported by the medical evidence in the record." *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987). A hypothetical question is likely supported by the medical evidence if the vocational expert reviewed the evidence and

attended the administrative hearing. *Ragsdale v. Shalala*, 53 F.3d 816, 818-21 (7th Cir. 1995). Thus, a hypothetical question is proper when the record supports the conclusion that the vocational expert considered the medical evidence. *Herron*, 19 F.3d at 337.

In this case, Hutton attended the administrative hearing and observed Hodges' testimony. Hutton testified that he reviewed the medical record and documents in forming his opinion. The ALJ's hypothetical included the limitations provided by the medical expert at the hearing and the SSA consulting physician's RFC evaluation. In this regard, the ALJ did not err in omitting Hodges' alleged Axis I psychotic disorder in the hypothetical because there is no objective evidence that Hodges actually suffers from such a disorder. The hypothetical was based on substantial evidence, and the record demonstrates that Hutton properly analyzed the medical record. This Court finds the hypothetical question posed to the vocational expert to be proper.

### D.    The ALJ Did Not Ignore An Entire Line Of Evidence

Hodges argues that the ALJ ignored an entire line of evidence for failing to discuss a number of Hodges' impairments including anxiety, depression, psychotic disorder, babesia, chest pain, leukopenia, arthritis, weakness, hyperglycemia, ectopic heart beats, and use of a PICC line. The ALJ did not ignore an entire line of evidence by failing to recite specifically to a few of Hodges' many complaints. An ALJ need not provide a complete written evaluation of every piece of evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Indeed, an ALJ cannot be expected to discuss every symptom mentioned in an extensive medical history such as the one presented here. All that is required is that the ALJ base his decision on substantial evidence and build a logical bridge from the evidence to his conclusion. The ALJ adequately discharged this duty.

22

Hodges argues that it is the Commissioner's policy to consider all of Hodges' impairments in combination. The ALJ must consider the combined effect of a claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. 20 C.F.R. § 416.923 (1991). The ALJ's decision correctly notes that Hodges symptoms are intermittent. Hodges rarely sought treatment for the same symptoms on consecutive doctor visits and, in the rare instances where the record demonstrates repeated complaints, Hodges condition was successfully treated with medication or surgery. The record does not support a consistent combination of impairments for the ALJ's consideration. Furthermore, three different consulting physicians reviewed the medical record and determined that Hodges is not disabled and Dr. Busse acknowledged that Hodges' exertional abilities are sedentary to medium despite his condition. The evidence in the record and cited by the ALJ in his decision thus reasonably support the conclusion that Hodges is not disabled.

### CONCLUSION

The Court's findings are not intended to minimize Hodges' symptoms in any way. Yet, the Court's empathy for Hodges' medical problems can not justify a ruling in his favor. The Court must affirm the ALJ's decision under the applicable legal standards. The ALJ conscientiously probed into the medical evidence and sufficiently articulated his analysis of the evidence in rendering his decision, thereby satisfying his duty to a pro se claimant. Accordingly, we deny Hodges' motion for summary judgment, and instruct the Clerk of the Court to enter a judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of the SSA Commissioner.

ENTERED:

Ruben Castillo
United States District Judge

Dated: November 9, 2005

23